UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
CAROLYN MASON, individually and as
Parent and Natural Guardian of A.D.,

                          Plaintiff,                **MEMORANDUM & ORDER**
                                             20-CV-4010 (PKC) (SJB)

      - against -

RICHARD CARRANZA, in his official
capacity as Chancellor of the New York City
Department of Education, and NEW YORK
CITY DEPARTMENT OF EDUCATION,

                        Defendants.
-------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

        Plaintiff Carolyn Mason brings this action individually and as parent and natural guardian of her minor son, A.D., pursuant to the Individuals with Disabilities Education Act ("IDEA"), codified at 20 U.S.C. §§ 1400 *et seq.* Plaintiff seeks review of a decision by a New York State Review Officer ("SRO"), affirming an Impartial Hearing Officer's ("IHO") denial of Plaintiff's challenge to her son's Individualized Education Plan ("IEP") for the 2018–19 school year. Specifically, the SRO and IHO rejected Plaintiff's request to be reimbursed for A.D.'s tuition and related services costs at the International Institute for the Brain ("iBRAIN") for the 2018–19 school year.

        For the reasons below, the Court affirms the SRO's decision, denies Plaintiff's motion for summary judgment, and grants Defendants' cross-motion for summary judgment. Plaintiff's Complaint is dismissed with prejudice.

## LEGAL STANDARDS

### I.      IDEA's Legal Framework

New York State must make a "free appropriate public education" ("FAPE") available to all children residing in the state with one or more qualifying disabilities in order to receive federal funding under the IDEA.   20 U.S.C. § 1412(a)(1)(A).   The New York City Department of Education ("DOE") is the local agency responsible for providing a FAPE to all qualifying disabled children.  *Melendez v. Porter*, No. 21-CV-579 (NGG) (LB), 2023 WL 4362557, at \*2 (E.D.N.Y. July 6, 2023) (adopting report and recommendation).   "To provide a FAPE to each student with a disability, a school district must develop an IEP that is 'reasonably calculated to enable the child to receive educational benefits.'"  *Ventura de Paulino v. N.Y.C. Dep't of Educ.*, 959 F.3d 519, 525 (2020) (quoting *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 151 (2d Cir. 2014)). Prior to the start of every school year, an "IEP team" for each student—known as a student's Committee on Special Education ("CSE") and consisting of the child's parent(s), teachers, school district representatives, and others—meets to create the student's IEP for the upcoming school year.  *Melendez*, 2023 WL 4362557, at \*3 (citations omitted).  "The IEP consists of an evaluation of the student's needs and a program of instructions that outlines 'the child's present educational performance, establishes annual short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'"  *Id.* (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)).

In addition, each state is required to develop an administrative review process for parents who "wish to challenge the adequacy of their child's IEP."  *Ventura de Paulino*, 959 F.3d at 525–26 (citing 20 U.S.C. § 1415(b)(6)–(8)).  New York State has implemented a "two-tier system of administrative review."  *Id.* at 526 (quoting *Mackey ex rel. Thomas M. v. Bd. of Educ.*, 386 F.3d 158, 160 (2d Cir. 2004)).  "In the first tier, a parent can file an administrative 'due process

complaint' [("DPC")] challenging the IEP and requesting a hearing before an [IHO]." *Id.* In the second tier, a party can appeal the IHO's decision to the SRO. *Id.* After the SRO renders a final decision, the aggrieved party can seek judicial review in state or federal district court. 20 U.S.C. § 1415(i)(2)(A).

## II.     Federal Standard of Review

"Although the parties have styled their submissions as motions for summary judgment, 'the procedure is in substance an appeal from an administrative determination, not a summary judgment.'" *C.U. v. N.Y.C. Dep't of Educ.*, 23 F. Supp. 3d 210, 222 (S.D.N.Y. 2014) (quoting *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005)). "Summary judgment thereby 'serves [only] as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in IDEA.' . . . 'The standard of review requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review.'" *Id.* (citations omitted); *see also id.* ("[T]he court conducts an 'independent' review of the administrative record, basing its decision on the 'preponderance of the evidence.'" (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 205 (1982))).

A federal court should not simply "rubber stamp" a state administrator's conclusions. *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 139 (2d Cir. 2013). Yet, federal courts must also be "mindful that [they] lack the 'specialized knowledge and educational expertise' possessed by state administrators, and therefore, [the former] will defer to [the latter's] well-reasoned opinions on issues of education policy." *J.D. v. N.Y.C. Dep't of Educ.*, 677 F. App'x 709, 711 (2d Cir. 2017); *see also R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012) ("[Federal courts] must give 'due weight' to the state proceedings, mindful that we lack 'the specialized knowledge and experience necessary to resolve . . . questions of educational policy.'" (citation omitted)). Especially "where the SRO and IHO agree, '[d]eference to the conclusions of

the administrators on the issue is particularly appropriate.'" *C.W. v. City Sch. Dist. of N.Y.*, 171 F. Supp. 3d 126, 131 (S.D.N.Y. 2016) (quoting *C.H. v. Goshen Cent. Sch. Dist.*, No. 11-CV-6933 (CS), 2013 WL 1285387, at *12 (S.D.N.Y. Mar. 28, 2013)); *see also B.K. v. N.Y.C. Dep't of Educ.*, 12 F. Supp. 3d 343, 360 (E.D.N.Y. 2014) ("[D]eference is particularly apt where the IHO and SRO decisions are in agreement and are based on the same record as that before the district court.").

"Parents who are dissatisfied with their child's education can unilaterally change their child's placement during the pendency of review proceedings." *Ventura de Paulino*, 959 F.3d 519, at 526 (citation omitted). Courts apply the three-part *Burlington/Carter* test[1] to determine whether the DOE is required to reimburse a parent for unilateral placement. *Id.* "A parent can obtain such reimbursement if: '(1) the school district's proposed placement violated the IDEA' by, for example, denying a FAPE to the student because the IEP was inadequate; (2) 'the parents' alternative private placement was appropriate'; and (3) 'equitable considerations favor reimbursement.'" *Id.* 526–27 (quoting *T.M.*, 752 F.3d at 152). The burden of proving all three prongs of the test rests on the party seeking relief. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 51 (2005). Regarding the first prong, the moving party must show one of two factors to prove that a child was denied a FAPE: "either (1) that the state did not comply with the procedural requirements of IDEA; or (2) that the challenged IEP was not 'reasonably calculated to enable the child to receive benefits.'" *Carrillo v. Carranza*, No. 20-CV-4639 (CM), 2021 WL 4137663, at *10 (quoting *Rowley*, 458 U.S. at 206–07).

---

[1] *Sch. Comm. of Burlington, Mass. v. Dep't of Educ.*, 471 U.S. 359, 373–74, (1985) ("Burlington"); *see also Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993) ("Carter").

# BACKGROUND

## I.    Factual Background[2]

Plaintiff is the parent and natural guardian of A.D., who is diagnosed with, among other things, cerebral palsy, intractable epilepsy, cortical vision impairment, microcephaly, and asthma. (Dkt. 41, at 1.)  A.D. was a ten-year old student at the end of the 2018–19 school year.  (*Id.*)  A.D. is non-verbal and non-ambulatory (R. 7–8)[3] and requires "a high degree of individualized attention and intervention throughout the school day" because of his "highly intensive management needs" (Dkt. 41, at 2.  Indeed, during the time period at issue, A.D. received "all means of nutrition, medications, and hydration through gastric and jejunal tubes, and was fully dependent in all domains of mobility and activities of daily living[.]"  (R. 8.)

### A.    2017–18 IEP

Plaintiff unilaterally placed A.D. at the International Academy of Hope ("iHOPE") for the 2017–18 school year.  (R. 964.)  After making this placement, Plaintiff filed a DPC in the state administrative system, arguing that the DOE did not provide A.D. with a FAPE for the 2017–18 school year, and sought a determination that iHOPE was an appropriate placement.  (*Id.*)  Moreover, Plaintiff sought to change A.D.'s classification from "multiple disability" to "traumatic brain injury."  (*Id.*)  The DOE conceded that it did not provide A.D. with a FAPE for that school year (conceding the first *Burlington/Carter* prong)—but argued that it was Plaintiff's burden to

---

[2] The following facts are taken from the Administrative Record (Dkt. 22) and the parties' motions (Dkts. 40–47).  The facts are undisputed unless otherwise stated.

[3] All references to "R." refer to the certified Administrative Record.  (*See* Dkt. 22.)  The Administrative Record is Bates-stamped with "Mason OSR Record [page number]" and the Court's citations herein use the Bates page numbers rather than the internal pagination of the constituent documents.

establish the appropriateness of her unilateral placement (the second *Burlington*/*Carter* prong) for the purposes of getting A.D.'s tuition and related services reimbursed. (R. 964.)

On March 23, 2018, IHO Israel S. Wahrman ("IHO Wahrman"), issued a decision ruling that iHOPE was an appropriate unilateral placement for A.D. and ordered the DOE to "directly pay iHOPE the tuition of $144,000 per year and the costs of related services for the [2017–18] school year." (R. 968–969.) Moreover, IHO Wahrman directed the DOE to "modify AD's IEP, within two weeks of receipt of this order, to make [] traumatic brain injury the classification and a 6-1-1[4] class ratio at a nonpublic school the program recommendation." (R. 968.)

## B.    Development of 2018–19 IEP

On March 15, 2018—a week before IHO Wahrman issued his decision about the 2017–18 IEP—A.D.'s CSE met and created his new IEP for the 2018–19 school year. (Dkt. 40, at 3; R. 8, 1246.) The CSE consisted of Plaintiff, Plaintiff's advocate, a school psychologist who also served as the district representative, a special education teacher/related service provider, another school psychologist, and the supervisor of psychologists. (R. 17.) Additionally, iHOPE staff participated in the meeting by phone, including the associate director, the director of assistive technology, a special education teacher, a speech-language pathologist, a vision therapist, an occupational therapist, and a physical therapist. (*Id.*) The meeting lasted nearly four hours. (R. 60.)

The CSE created the 2018–19 IEP, which categorized A.D. as a student with "multiple disabilities" and "recommended a '12+1+(3:1)'[5] special class placement in a district specialized

---

[4] A "6-1-1" or "6:1:1" ratio is classroom with no more than six students, one teacher, and one paraprofessional. *See M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 227 (2d Cir. 2012). Thus, there are a total of two adults for six students.

[5] The parties also refer to this placement as a 12:1+4 (or 12:1:4) placement. (*See* Dkt. 46, at 4.) This ratio refers to a classroom with no more than 12 students, one teacher, and one

school, along with the support of a full time 1:1 paraprofessional, and related services of three 30-minute sessions of individual occupational therapy [] per week, five 30-minute sessions of individual physical therapy [] per week, five 30-minute sessions of speech-language therapy per week, three 30-minute sessions of vision education services per week, and one 60-minute session of parent counseling and training per month, as well as special transportation."  (R. 8.)

Eight days later, on March 23, 2018, IHO Wahrman's decision regarding the 2017–18 IEP was issued, directing the DOE, *inter alia*, to "modify AD's IEP, within two weeks of receipt of this order, to make the traumatic brain injury the classification and a 6-1-1 class ratio at a nonpublic school the program recommendation."  (R. 968.)  According to Plaintiff, on April 20, 2018, her attorney, Peter G. Albert,[6] emailed a letter to the CSE.  (R. 26, 854–55.)  The letter asked for the CSE to reconvene and address "the issues outlined in the recent decision by Hearing Officer Israel Wahrman" and "consider a placement in a non-public school."  (R. 1088.)  Moreover, the letter requested that the meeting take place at iHOPE, that it occur on a Wednesday or Thursday after 3:00 p.m., and that a "DOE School Physician participate in person."  (*Id.*)  The CSE disputes ever receiving Plaintiff's April 20th letter (R. 448) and Plaintiff concedes that she does not personally know if the letter was sent (R. 855).  (*See also* R. 26 (SRO noting that "the hearing record is not clear as to whether the district was provided an appropriate notice of the parent's request for a reconvene.").)  Regardless, it is undisputed that the CSE did not meet again about A.D.'s 2017–18 IEP after the original March 15, 2018 meeting.

---

supplementary staff person (non-teacher) for every three students, or a total of five adults for the 12 students.  *See Carrillo*, 2021 WL 4137663, at *2 (explaining 12:1:4 placements).

[6] Mr. Albert represented Plaintiff during the administrative process and also represents Plaintiff in the instant action.

On June 13, 2018, Plaintiff signed a contract enrolling A.D. in iBRAIN, a newly opened, breakaway school from iHOPE.[7]  (R. 1077.)  On June 21, 2018, Plaintiff sent the DOE a ten-day notice, indicating that she intended to unilaterally enroll A.D. at iBRAIN because "[t]he DOE has not conducted an annual IEP" for A.D.  (R. 1090.)

## II.   Procedural Background

### A.   Due Process Complaint

On July 9, 2018, Plaintiff, through counsel, filed a DPC seeking "an interim order of pendency" to allow A.D. to remain at iBRAIN at the local district's expense during the pendency of any administrative and judicial proceedings.[8]  (R. 898.)  Plaintiff argued that the DOE had failed to provide a FAPE to A.D. in the 2018–19 IEP on the following grounds:

1.  The DOE "failed to hold an annual review meeting at a time that was mutually agreeable with [Plaintiff] and which complied with [Plaintiff's] documented request for a Full Committee meeting . . . ."  (R. 899.)

2.  Some CSE members only "feigned interest in the independent evaluations and reports provide[d]" by various teachers and therapists, provided on Plaintiff's behalf.  (*Id.*)

---

[7]  Although irrelevant to the Court's analysis, the Court notes the "unusual circumstances" regarding the "mass exodus of students from iHOPE to iBRAIN" during the summer of 2018. *Ventura de Paulino*, 959 F.3d at 528–29; *see also Ferreira v. N.Y.C. Dep't of Educ.*, Nos. 19-CV-2937 (JMF), 19-CV-8519 (JMF), 2020 WL 1158532, at *2 n.1 (S.D.N.Y. Mar. 6, 2020) ("iB[RAIN] appears to have been started 'by the same individual who founded iH[OPE],' [Patrick Donohue,] and 'contain[s] many of the same students and staff.' (citation omitted)); *id.* ("Intriguingly, in July 2018—right around the time of the 'split' or 'ouster' [of Donohue]—a whistleblower complaint was filed by an iHOPE employee, which alleged that . . . Donohue[] was simultaneously running a law firm to which iHOPE paid $165,000 per year as part of a scheme 'to funnel federal and state education funds to Donohue personally.'" (citation omitted)); *id.* ("Notably, Donohue also appears to be the founder of Brain Injury Rights Group, a different law firm that represents Plaintiff here and the plaintiffs in many, if not all, of the other cases seeking funding at iB[RAIN]." (citation omitted)).  Here, as noted *supra* n.6, Plaintiff is represented by Patrick G. Albert of Brain Injury Rights Group.

[8]  The IDEA, under the "pendency" or "stay-put" provision, provides for a child to remain "in his or her then-current educational placement" with public funding while administrative and judicial proceedings are pending. *Ventura de Paulino*, 959 F.3d at 526 (citing 20 U.S.C. § 1415(j)).

3. The IEP was inappropriate because it did not classify A.D. as having a "Traumatic Brain Injury." (*Id.*)

4. The 12:1+4 class ratio in a specialized public-school placement did not represent the "Least Restrictive Environment" ("LRE") for A.D. (R. 900.)

5. The 12:1+4 class ratio was too large to "ensure the constant 1:1 support and monitoring [A.D.] require[d] in order to remain safe and d[id] not offer the 1:1 support and monitoring [A.D.] require[d] to make any progress under the IEP." (*Id.*)

6. The specialized public-school placement did not offer an extended school day, which A.D. needed. (*Id.*)

Lastly, the DPC proposed the following terms of settlement: (1) direct DOE funding of A.D.'s tuition at iBRAIN for the 2018–19 extended school year; (2) DOE funding of A.D.'s transportation costs including a 1:1 travel aid; and (3) reconvening the CSE for an annual review. (*Id.*)

## B. IHO Hearing and Denial

On September 12, 2018, IHO Audrey Daniel ("IHO Daniel") issued an order granting pendency placement at iBRAIN, retroactive to July 9, 2018.[9] (R. 35–36.) The matter was then reassigned to IHO Suzanne M. Carter ("IHO Carter") (R. 53) on April 4, 2019. (R. 55.) IHO Carter held hearings on July 17, August 9, and August 16, 2019. (R. 56.) On January 13, 2020, IHO Carter issued a decision finding that the DOE *had* provided A.D. with a FAPE for the 2018–19 school year and consequently denied Plaintiff's requests for reimbursement of tuition, transportation costs, and related services costs for iBRAIN for the 2018–19 extended school year.

---

[9] The Court notes that in May 2020, the Second Circuit held that the IDEA stay-put provision did not require the DOE to provide pendency funding to parents who had unilaterally moved their students to iBRAIN when iHOPE was the previously-determined appropriate placement. *See Ventura de Paulino*, 959 F.3d at 537 ("Accordingly, regardless of whether iBRAIN provided the Students' last agreed-upon educational program in a manner substantially similar to iHOPE, when the Parents unilaterally enrolled the Students at iBRAIN, the Parents did so at their own financial risk.").

(R. 56, 75.)   Specifically, IHO Carter made the following findings regarding her FAPE

determination:

1. None of Plaintiff's alleged procedural violations—that the CSE's meeting was
   untimely, that the CSE was not properly composed, that Plaintiff's request to
   reconvene was ignored—constituted denying A.D. a FAPE.  (R. 58–63.)

2. "[M]ultiple disabilities" was a "better classification" for A.D than "traumatic
   brain injury."  (R. 63–64.)

3. The IEP's 12:1+4 ratio was more appropriate for A.D. than the 6:1:1 ratio
   because the latter "does not have the supplementary school staff needed to work
   with [A.D.]."  (R. 64–65.)

4. The IEP's 30-minute sessions (as opposed to 60-minute sessions) for
   occupational therapy, physical therapy, and speech language therapy were
   appropriate because A.D. "emotionally and physically can't sustain a longer
   period of time than that."  (R. 66.)

5. Plaintiff's DPC had not raised the CSE's failure to recommend an assistive
   technology device and service, but even addressing it on the merits, the
   "testimony support[ed] that use of the device would continue."  (R. 67.)

Once IHO Carter found that the 2018–19 IEP provided A.D. with a FAPE, she did not need

to analyze the remaining factors in the *Burlington/Carter* test; i.e., whether iBRAIN was an

appropriate placement and whether the equities favored Plaintiff.  *Burlington*, 471 U.S. at 370.

Yet, she proceeded to analyze the remaining two issues on the merits because "the litigious posture

of th[e] case require[d] a complete analysis to have a well-developed record" and concluded that

iBRAIN was not an appropriate placement and that the equities did not favor Plaintiff.  (R. 69–

75.)  IHO Carter made the following findings in support of this conclusion:

1. iBRAIN moved locations three times in the 2018–19 school year, from Lower
   Manhattan to a Columbus Avenue location, to the Upper East Side.  (R. 70.)

2. When iBRAIN opened, the school did not have providers for vision education
   services, assistive technology services, or parent counseling and training.  (R.
   71.)  Vision education was unavailable for at least the first three months of the
   school year.  (R. 72.)  Plaintiff was unaware that iBRAIN lacked an assistive
   technology provider and was not aware that a vision education teacher was not

10

available for approximately three months.  (R. 72, 861–62.)  Placement at iBRAIN was "inappropriate" because of the "lack of vision education services[.]" (R. 72.)  Although iBRAIN's employee testified that A.D.'s vision education services were "made up," there was no documentary evidence in the record to corroborate that testimony.  (*Id.*)

3.  Equitable considerations did not favor Plaintiff, in part because one of Plaintiff's purported reasons for moving A.D. to iBRAIN was because iHOPE lacked vision therapy.  (R. 72–73.)

4.  iBRAIN's tuition and related service costs were excessively high.  (R. 73–74.)[10]

5.  iBRAIN's IEP appeared to be copied and pasted from iHOPE's 2017–18 IEP, and iBRAIN's Special Education Director Tiffany Semm's[11] testimony on whether the IEP was properly reviewed and created was "convoluted." (R. 74.)

6.  Plaintiff did not cooperate with education planning for A.D. because she "failed to visit the recommended public[-]school placement." (R. 75.)

## C.   SRO Affirmance

On February 24, 2020, Plaintiff appealed IHO Carter's decision.  (R. 80.)  SRO Sarah Harrington ("SRO Harrington") issued a lengthy decision on April 29, 2020, affirming IHO Carter's decision.  (*See* R. 6–29.)  Specifically, SRO Harrington upheld IHO Carter's ruling that the DOE had offered A.D. a FAPE for the 2018–19 school year, and accordingly declined to analyze whether iBRAIN was an appropriate placement or whether the equities favored Plaintiff. (*Id.*)  SRO Harrington made the following conclusions:

1.  Plaintiff's claim regarding assistive technology was outside the scope of review because it was not raised in Plaintiff's DPC.  (R. 15.)

2.  The March 2018 IEP meeting was timely because it produced a prior written notice and school location letter to Plaintiff before the start of the 2018–19 school year.  (R. 15–16.)

---

[10] The Court takes judicial notice of the Second Circuit's note in *Ventura de Paulino*, that "counsel for the City informed [the panel at oral argument], without contradiction, that the cost of attending iBRAIN was significantly higher [than iHOPE] . . . ."  959 F.3d at 535 n.69.

[11] (*See* R. 54 (listing Ms. Semm's credentials).)

3. The DOE sent timely notice to Plaintiff on February 27, 2018, scheduling the March 2018 IEP meeting, and Plaintiff did not request that the school physician participate, despite being advised of her right to do so. (R. 17.)[12]

4. The March 2018 CSE was properly constituted and included all required members, including Plaintiff, her advocate, and staff from iHOPE. (R. 18.)

5. The March 2018 CSE reviewed sufficient information and evaluations of A.D. in creating the IEP. (R. 18–20.) Specifically, although Plaintiff claimed that the March 2015 psychological evaluation was insufficient to provide the CSE with current information about the student's needs, SRO Harrington relied on the psychologist supervisor's testimony that the CSE also reviewed other, more current evaluations and believed they were sufficient. (R. 18–19.)

6. A.D.'s classification as a student with "multiple disabilities" did not deny him a FAPE. In particular, SRO Harrington explained that "CSEs are not supposed to rely on the disability category to determine the needs, goals, accommodations, and special education services in a student's IEP[,]" rather, an IEP should "identify all of the student's special education and related services needs, whether or not commonly linked to the disability category in which the student has been classified[.]" (R. 20.) SRO Harrington specifically responded to Plaintiff's argument that "traumatic brain injury" is "what drives [A.D.'s] educational needs[,]" explaining that "while iB[RAIN]'s director's testimony focused on the student's eligibility classification itself, the IEP contains a wealth of information regarding the student's needs and sufficiently identified the areas of concern related to classification raised in the iB[RAIN] director's testimony." (R. 22.)

7. Plaintiff's argument regarding the 12:1+4 placement not being the LRE for A.D. was misplaced because the LRE requirement refers to "the ratio of special education to general education students in the same classroom"—which was inapposite in A.D.'s case because all parties agreed that he should not be in a classroom with general education students. (R. 22–23.)

8. The 12:1+4 placement was appropriate for A.D. (R. 24.) Specifically, SRO Harrington reasoned that Plaintiff was being too strict in her reliance on a 6:1+1 ratio, and that "it is no mistake that the adult-to-student ratio required in a 6:1+1 special class and a 12:1+4 special class is a similar ratio, albeit with a greater

---

[12] Plaintiff appears to allege, with respect to the absence of a physician at the March 2018 meeting, that the DOE ignored her *April 2018* letter, in which she requested that a physician attend a reconvened CSE meeting because one had not been present for the March 2018 meeting. (*See* Dkt. 45, ¶ 37; Dkt. 41, ¶¶ 66–67; R. 855–59.) This allegation is plainly nonsensical because Plaintiff's April 20th letter was sent *after* the March 2018 meeting had occurred, and further, it is unclear whether the April 2018 letter was actually sent (*see supra* Background Section I.B, *infra* pp. 15–16).

variety in the type of school personnel typically found working with a student in the 12:1+4 special class setting—the very type of providers that [A.D.] requires and are not found in the definition of a 6:1+1 special class." (*Id.*)

9.  The hearing record supported the recommendation of 30-minute related-services sessions because of A.D.'s "documented difficulties with fatigue and alertness levels[.]" (R. 26.)

10. The evidence was inconclusive regarding whether the DOE ever received a copy of Plaintiff's April 20, 2018 letter asking, among other things, that the CSE reconvene. (R. 26–27.) Thus, it was not appropriate to fault the DOE for not reconvening given the "conflicting evidence regarding [the letter's] transmission to the district." (R. 27.) Moreover, SRO Harrington reasoned that even if the letter had been received, a failure to reconvene the CSE did not deprive A.D. of a FAPE because a timely meeting had already been convened for the upcoming school year in March 2018 and Plaintiff had fully participated. (R. 27.)

After finding that Plaintiff did not prove A.D. was deprived of a FAPE and thus failed the first prong of the *Burlington/Carter* test, SRO Harrington did not analyze the second and third prongs of the *Burlington/Carter* test—whether iBRAIN was an appropriate unilateral placement and whether the equities favored Plaintiff. (R. 28–29.) SRO Harrington thus dismissed Plaintiff's appeal. (R. 29.)

### D.  Federal Review

Plaintiff commenced this action seeking federal review of SRO Harrington's decision on August 27, 2020. (Dkt. 1.) Defendants filed their answer on January 25, 2021. (Dkt. 17.) On August 18, 2022, Defendants filed their cross-motion for summary judgment (Dks. 40–43), and Plaintiff filed her motion for summary judgment on August 19, 2022 (Dkts. 44–46) and her reply on August 20, 2022 (Dkt. 47).

### DISCUSSION

The Court finds that both SRO Harrington's and IHO Carter's decisions are thorough and well-reasoned, and supported by more than a preponderance of the evidence. Thus, the Court accords their decisions the deference they are owed. *See Walczak v. Fla. Union Free Sch. Dist.,*

142 F.3d 119, 129 (2d Cir. 1998) ("Deference is particularly appropriate when . . . the state hearing officers' review has been thorough and careful.").

## I.     Defendants Offered A.D. a FAPE for the 2018–19 School Year

### A.     SRO Properly Determined that 2018–19 IEP Was Procedurally Adequate

"Procedural flaws do not automatically require a finding of a denial of a FAPE.  Only procedural inadequacies that individually or cumulatively result in the loss of educational opportunity or seriously infringe on a parent's participation in the creation or formulation of the IEP constitute a denial of FAPE."  *Carrillo*, 2021 WL 4137663, at *11 (citation omitted).  The IDEA provides that "a hearing officer may find a child did not receive a [FAPE] only if procedural inadequacies: (i) impeded the child's right to a FAPE; (ii) significantly impeded the parents' opportunity to participate in the decision[-]making process regarding the provision of a [FAPE]; or (iii) caused a deprivation of educational benefits."  20 U.S.C. § 1415(f)(3)(E)(ii).

Plaintiff alleges three procedural flaws in the creation of A.D.'s IEP, but the IHO and SRO both concluded that none of them—individually or collectively—denied him a FAPE.  The Court agrees.

#### 1.     Meeting Notices

Plaintiff explains that the "DOE sent [Plaintiff] a meeting notice, dated February 14, 2018, scheduling an IEP meeting for April 24, 2018 . . . and a second meeting notice, dated February 27, 2018, scheduling an IEP meeting for March 15, 2018."  (Dkt. 46, at 14.)  She then alleges that "[b]oth notices indicated that '[t]he IEP meeting [for A.D.] must be held no later than 01/30/2018" and thus argues that "[a]ssuming the date was accurate, then the CSE meetings were months overdue, and effectively denied A.D. a FAPE for several months . . . ."  (*Id.*)  However, the SRO and IHO determined that the 1/30/2018 date was a typographical error (R. 15–16), and moreover, both concluded that the law only requires that an IEP is created before the upcoming school year,

14

which was properly achieved by the March 2018 CSE meeting (R. 16).  The Court agrees and does not find that the meeting notices or the meeting's timing denied A.D. a FAPE.  *See Carrillo*, 2021 WL 4137663, at \*11 ("The law requires only that the child have an IEP in place by the start of the new school year . . . .").

2.   <u>Plaintiff's Meaningful Participation in the IEP Meeting</u>

Next, Plaintiff alleges that she, as A.D.'s parent, was not provided an opportunity to meaningfully participate in a reconvened IEP meeting in response to her April 20, 2018 letter, in part, because a meeting was never convened in response to that letter.  Moreover, she claims that her April 2018 letter requested that a "DOE School Physician participate in person[,]" that the CSE address the issues outlined by IHO Wahrman,[13] and that the CSE consider placing A.D. in a nonpublic school—all of which were ignored because the CSE did not reconvene after April  20, 2018.  (Dkt. 46, at 14–15.)  The SRO found that "the hearing record is not clear as to whether the district was provided appropriate notice of the parent's request for a reconvene . . . . [Thus,] it would be difficult to hold the district accountable for failing to respond to a letter where there is conflicting evidence regarding its transmission to the district."  (R. 26–27.)  The Court agrees that it appears the DOE never received Plaintiff's April 20, 2018 letter (*see* R. 448, 855), and thus the record does not permit the Court to conclude that the SRO erroneously found no failure to reconvene.  *See Z.C. v. N.Y.C. Dep't of Educ.*, 222 F. Supp. 3d 326, 334 (S.D.N.Y. 2016) ("[I]t is sufficient that the SRO 'acknowledge[s] the position' of Plaintiff's witnesses 'before explaining why he [or she] disagree[s] based on his view of the evidence.'" (quoting *A.A. v. N.Y.C. Dep't of*

---

[13] The Court notes that Plaintiff's references to IHO Wahrman's decision regarding A.D.'s 2017–18 IEP are irrelevant to the instant action.  *See infra* Discussion Section I.B.1.

15

*Educ.*, 14-CV-8483 (ALC), 2015 WL 10793404, at *10 (S.D.N.Y. Aug. 24, 2015))).  Moreover, even assuming the CSE received Plaintiff's April 2018 letter and intentionally ignored her requests, such failure to reconvene did not impede A.D.'s right to a FAPE or significantly impede Plaintiff's participation in developing an IEP because, as the SRO correctly found, the March 2018 IEP meeting had already timely occurred and Plaintiff had participated fully at that meeting.  (R. 27–28 (finding that "[Plaintiff] 'had a nearly four-hour long meeting with iHope staff and sufficient information about the [s]tudent' and also that [Plaintiff] had not objected at the March 2018 CSE's meeting to the district's physician not being present'" (citation omitted)).)  Thus, the failure to reconvene is not a procedural inadequacy that rises to a denial of a FAPE.  *See* 20 U.S.C. § 1415(f)(3)(E)(ii).

Additionally, Plaintiff argues that the March 15, 2018 IEP meeting was deficient because no medical doctor attended.  However, the SRO found no evidence in the record that Plaintiff had requested the attendance of a physician or any other medical professional prior to the March meeting—only that Plaintiff had inquired *during* the IEP meeting about involving A.D.'s neuropsychologist.  (R. 18.)  Thus, the CSE was properly composed and did not violate any regulations.  (*Id.*)  The Court has thoroughly reviewed the record and agrees with the SRO's conclusion.

### 3. CSE Used Allegedly Outdated Evaluations

Lastly, Plaintiff alleges that the "CSE utilized a psychological evaluation dated March 20, 2015[,]" which Plaintiff admits "technically" complied with New York's regulations, but nevertheless argues that the report "did not provide the CSE with current evaluative information upon which an IEP should have been based."  (Dkt. 46, at 16.)  Further, Plaintiff claims that the DOE should have used updated psychological evaluations as part of a reconvened IEP meeting in

considering a nonpublic-school placement for A.D., as requested in Plaintiff's April 2018 letter. (*Id.*)

SRO Harrington rejected these arguments, finding that the March 2018 CSE reviewed sufficient information and evaluations of A.D. in creating the 2018–19 IEP.  (R. 18–20.) Specifically, although Plaintiff felt that the March 2015 psychological evaluation was insufficient to provide the CSE with current information, SRO Harrington credited the hearing testimony of the CSE's psychology supervisor, who stated that the CSE had also reviewed other, more current evaluations and that the CSE believed that they were sufficient.  (R. 19–20.)  IHO Carter, similarly, found that "the CSE had sufficient data from [A.D.'s] iHOPE progress reports with present levels of performance and IEP as well as input from the iHOPE teacher and related service providers." (R. 60–61.)  The Court defers to the SRO and IHO's evaluation of the record and expert testimony, and agrees that the CSE had sufficient current information when creating A.D.'s 2018–19 IEP. *See E.W.K. ex rel. B.K. v. Bd. of Educ.*, 884 F. Supp. 2d 39, 56 (noting that the Second Circuit "reversed a district court for holding that '[n]either the IHO nor the SRO . . . gave appropriate consideration to the experts on dyslexia, who had personal knowledge of the student in question.'" (quoting *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 383 (2d Cir. 2003))); *id.* ("This Court . . . defers to the IHO and SRO's evaluation of the competing testimony of the Parties' expert witnesses.").

***

In sum, the Court finds that none of Plaintiff's alleged procedural flaws, individually or collectively, amount to a denial of a FAPE for the 2018–19 school year.

### B.    SRO Properly Determined that 2018–19 IEP was Substantively Adequate

Plaintiff raises six grounds to argue that A.D.'s IEP was not substantively appropriate. (Dkt. 46, at 16–21.)  The Court addresses each ground below.

        1.       IHO Wahrman's 2017–18 Decision

First, Plaintiff argues that IHO Wahrman's March 23, 2018 decision regarding A.D.'s 2017–18 IEP was the "roadmap for the CSE moving forward," and therefore the CSE's failure to reconvene after the decision's issuance "ignored IHO's [sic] Wahrman's clear directives." (Dkt. 46, at 17.) However, Plaintiff herself admitted during the underlying administrative proceedings that the compliance—or lack thereof—with IHO Wahrman's decision regarding the 2017–18 IEP had no bearing on the 2018–19 IEP. Indeed, Plaintiff's counsel had the following exchange with IHO Carter during one of the DPC hearings:

> [IHO Carter]: And . . . if the CSE failed to follow the IHO order for '17/'18, what is the correct form for adjudication?
>
> [Plaintiff's counsel]: *Well, it wouldn't be an issue for [t]his hearing officer.* . . . It's raised solely because there's an – there's a document, and there will be testimony from the parent that since IHO Wahrman's decision followed from the March 15th CSE meeting, there was a specific request by the Parents in April to reconvene to follow that hearing officer's direction, and also to address '18/'19.
>
> . . . .
>
> [IHO Carter]: But the due process complaint can only address what the Parents -- well, allegations for '18/'19.
>
> [Plaintiff's counsel]: Absolutely.
>
> [IHO Carter]: *Therefore, anything regarding '17/'18, and the CSE's alleged failure to follow that order, is not before me.*
>
> [Plaintiff's counsel]: *Agreed.*

(R. 656–57 (emphases added).) Thus, Plaintiff conceded that the only relevance IHO Wahrman's decision had to this instant action and the administrative hearings below was to the extent it was mentioned in the April 2019 letter. However—as addressed by the SRO, IHO, and this Court— the evidence regarding whether the letter was sent is unsettled at best. *See supra* Discussion Section I.A.2.

In any event, IEPs for a previous school year are not binding on the following school year. *See Carrillo*, 2021 WL 4137663, at \*14 n.8 ("It is not insignificant that IHO Carter herself – the author of "the roadmap" – did not consider her decision relating to 2017-18 to bind her in any way with regard to 2018-19, but instead rendered an entirely different decision for that year's IEP, after listening to days of evidence at a new and different impartial hearing – one at which the district appears to have cured some of the defects in its presentation of the previous year."); *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Ed.*, 226 F.3d 60, 67 (2d Cir. 2000) (finding that the defendant's inadequate IEP for the student's eighth grade school year was not relevant to whether his IEP for ninth grade was adequate); *J.R. v. N.Y.C. Dep't of Educ.*, 748 F. App'x 382, 386 (finding that "the DOE's funding of [the student]'s schooling in other years is irrelevant: 'the adequacy <u>vel non</u> of an IEP . . . is to be judged on its own terms.' . . . Whether the DOE offered [the student] an appropriate placement in other years 'makes no difference' to the question of whether the IEP provided a FAPE in 2013–14." (quoting *M.C. v. Voluntown Bd. of Educ.*, 226 F.3d at 67)). Thus, SRO Harrington and IHO Carter properly did not factor in IHO Wahrman's 2017–18 decision in adjudicating Plaintiff's DPC as to A.D.'s 2018–2019 IEP, and Plaintiff's reliance on that decision in this action is entirely misplaced.

### 2. A.D.'s Disability Classification

Next, Plaintiff alleges that the DOE improperly changed A.D.'s disability classification from "traumatic brain injury" to "multiple disabilities." (Dkt. 46, at 17.) Specifically, Plaintiff points to the testimony of Ms. Semm, the Director of Special Education at iBRAIN, who testified that A.D.'s seizure disorder was what drove his educational needs. (*Id.*) However, IHO Carter found that "seizure disorder" did not necessarily indicate that A.D. had a brain injury. (R. 64.) Rather, IHO Carter explained that because Plaintiff testified that A.D.'s "brain injury [] happened shortly after birth[,]" (R. 819), and New York's regulations define "traumatic brain injury" as "*not*

includ[ing] injuries that are congenital or *caused by birth trauma*"—it can be inferred that "birth trauma is the *etiology* of [A.D.'s] overall disabilities" (R. 63–64 (emphases added) (quoting N.Y. Comp. Codes. R. & Regs tit. 8, § 200.1(zz)(12)). Thus, IHO Carter concluded that "multiple disabilities" "[was] a better classification for [A.D.] because it considers all of his impairments." (R. 64.)[14]

Moreover, the issue of disability classification "is a red herring" as "[d]isability classification is used for one and only one purpose: to ascertain whether a child f[a]lls into one of the 13 categories that render her[/him] eligible for special education services." *Carrillo*, 2021 WL 2021 WL 4137663, at *15; *see also M.R. v. Orangetown Centr. Sch. Dist.*, No. 10-CV-1800 (CS), 2011 WL 6307563 (S.D.N.Y. Dec. 16, 2011) ("It is not the classification *per se* that drives IDEA decision making; rather, it is whether the placement and services provide the child with a FAPE."); *id.* (concluding that the plaintiff and defendant could disagree on the student's "classification without [the student] being denied a FAPE"); *Polanco v. Porter*, No. 21-CV-10176 (JGK), 2023 WL 2242764, at *6 ("[W]ell-reasoned decisions in other circuits have clarified that a student's disability classification is generally immaterial in determining whether a FAPE was provided if the IEP otherwise sufficiently met the needs of the disabled student." (collecting cases)).

Here, IHO Carter concluded that "multiple disabilities" was a better classification for A.D. than "traumatic brain injury," and SRO Harrington found that the IEP was correctly tailored to A.D.'s needs regardless of classification. (*See* R. 63–64 (IHO Carter finding that "multiple disabilities" was a "better classification" for A.D than "traumatic brain injury"); R. 22 (SRO

---

[14] "Multiple disabilities" is defined as "concomitant impairments (such as intellectual disability-blindness, intellectual disability-orthopedic impairment, etc.), the combination of which cause such severe educational needs that they cannot be accommodated in a special education program solely for one of the impairments." (R. 64 (citing N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(zz)(8)).)

Harrington finding that "while iB[RAIN]'s director's testimony focused on the student's eligibility classification itself, the IEP contains a wealth of information regarding the student's needs and sufficiently identified the areas of concern related to classification raised in the iB[RAIN] director's testimony.").)  The Court finds both administrative hearing officers' reasoning to be well-supported by the record, and moreover, finds the issue irrelevant to determining whether A.D. was provided a FAPE.  Thus, A.D.'s disability classification did not substantively deprive him of a FAPE.

3.    A.D.'s Highly Intensive Management Needs and 12:1+4 Class Size

Plaintiff's insistence that A.D. is properly classified as having a traumatic brain injury is contextualized by Plaintiff's next argument, which is that the CSE should have placed A.D. in a 6:1+1 class size rather than a 12:1+4 placement.  *See Carrillo*, 2021 WL 4137663, at *15–16 (explaining that New York regulations require a maximum of 6:1+1 for students with "traumatic brain injuries," but a maximum of 12:1+4 for students with "severe multiple disabilities").  Aside from the fact that, as discussed, Plaintiff is properly classified as not having traumatic brain injury, both IHO Carter and SRO Harrington found, based on thorough reviews of the record, that A.D. was better suited for a 12:1+4 class size.  IHO Carter concluded that the IEP's 12:1+4 ratio was more appropriate for A.D. than the 6:1+1 ratio because the latter "does not have the supplementary school staff needed to work with [A.D.]."  (R. 65–66.)  SRO Harrington similarly reasoned that "it is no mistake that the adult-to-student ratio required in a 6:1+1 special class and a 12:1+4 special class is a similar ratio, albeit with a greater variety in the type of school personnel typically found working with a student in the 12:1+4 special class setting—the very type of providers that [A.D.] requires and are not found in the definition of a 6:1+1 special class."  (R. 24.)  Further, SRO Harrington found that A.D. "benefited from[] close monitoring for injury prevention, aspiration, allergen exposure, and severe allergic reaction; reduced lighting and environmental noise, as well

21

as the use of sunglasses and noise-canceling headphones," making the additional adults in a 12:1+4 classroom especially appropriate. (*Id.*)

The Court has reviewed the record and finds that SRO Harrington's conclusion is supported by a preponderance of the evidence, and thus defers to her conclusion.[15] *See Carrillo*, 2021 WL 4137663, at *17 (finding that classroom size and ratio placements, is "precisely the sort of decision that a person like the SRO, who has extensive experience in the education of profoundly disabled children, is equipped to make—and that this court is ill-equipped to second guess").

### 4.   Class Grouping

Next, Plaintiff's argue that the CSE failed to recommend a class grouping of students with "similar individual needs as well as similar: [sic] academic levels and learning characteristics; levels of social development; levels of physical development; and, management needs." (Dkt. 46, at 19.)   Specifically, Plaintiff points to a DOE witness's testimony that the students in the specialized public school recommended for A.D. "exhibited a 'wide range' range [sic] of needs[.]" (*Id.* at 20 (citing R. 613).)   However, first, SRO Harrington found that Plaintiff waived her argument to class grouping because she never visited the public school placement, and thus could

---

[15] Plaintiff's witness, Ms. Semm, testified that a 12:1+4 setting was inappropriate for A.D. because "[h]e's very, very easily startled. . . . [S]tudents make more noise and [are] more likely to make startling noises or unexpected noises than staff" and "noise is a very common seizure trigger for A.D." (R. 695–96.)   However, SRO Harrington noted that A.D. benefits from noise-cancelling headphones (R. 24) and A.D.'s previous iHOPE IEP similarly identified that "[w]hen in noisy environments, [A.D.] uses headphones to limit startle response and discomfort." (R. 984.)   Thus, SRO Harrington could have reasonably concluded that the potentially noisier environment in the 12:1+4 setting could be appropriately mitigated.   Moreover, Rochelle Flemister, the district's Supervisor of Psychologists, testified that a 12:1+4 setting was the "least restrictive environment" for A.D. and was specifically appropriate for his "intensive management needs." (R. 364.)   Thus, despite Ms. Semm's testimony, SRO Harrington's conclusion that a 12:1+4 classroom size was appropriately supported by other testimony and evidence in the record.   The Court further notes that Plaintiff claims "there is no record evidence that the recommended 12:1:4 class was appropriate[.]" (Dkt. 46, at 19.)   However, for the foregoing reasons, the Court finds that assertion to be baseless.

not know what the class grouping would be.  (R. 24, n.11 ("The student did not attend the public

school and the parent had not visited the public school since 2015. . . . Accordingly, the parent was

not aware of how the student would have been grouped at the public school for the 2018–19 school

year at the time she placed the student at iBrain. . . . Any evidence about how the student would

have been grouped if he had attended the public school is necessarily [and impermissibly]

retrospective." (internal citations omitted)).)

Even on the merits, the Court finds that Plaintiff misconstrues the DOE witness's testimony

and that the CSE recommended an appropriate class grouping.  The DOE witness had the following

exchange with Plaintiff's counsel before IHO Carter:

> [Plaintiff's counsel]: Could you tell me -- or tell us, rather, whether the students,
> the approximately 84 students who attend the 12:1:4 classes, have a wide range of
> physical needs, developmental needs?
>
> [DOE witness]: 12:l:4s, based on their classification, those are the students that
> typically need the most need, the most support.  It's -- it's the most restrictive
> setting, so I would say all the students in 12:1:4 have a great amount of needs, based
> on their classifications.
>
> [Plaintiff's counsel]: Okay. My question was do they have a wide range of needs.
>
> [DOE witness]: A wide range? Same thing, I would say based on their
> classification.  I would also say all our students have a wide range of needs,
> regardless of their classification.  That's why they're in District 75.

(R. 613 (emphases added).)  It is evident from this exchange that the *reason* the students are

grouped together in the specialized "District 75" school is *because* they all have a wide range of

needs—as might be expected from students who are categorized as having "multiple severe

disabilities."  Thus, Plaintiff's allegation that the CSE did not recommend an appropriate class

grouping fails on the merits.

5.    Frequency and Duration of Related Services

Plaintiff next argues that IHO Carter and SRO Harrington were wrong to conclude that

30-minute sessions for related services were appropriate for A.D., as opposed to 60-minute

sessions.  (Dkt. 46, at 20.)  In particular, Plaintiff asserts that "DOE offered no credible testimony or evidence to explain why the CSE reduced A.D.'s related service mandates across the board." (*Id.*)  However, this assertion is plainly wrong.  The record is replete with evidence that A.D. struggles with staying awake, staying engaged, and being lethargic.  (*See, e.g.*, R. 356 (Ms. Flemister testifying that A.D. "is lethargic, and, . . . sleeps a lot[,]"); R. 357 (Ms. Flemister testifying that A.D. "is frequently lethargic.  As I was reading, even when there was observation, he was sleepy.  I remember also the parent sharing, that, you know, at home he sleeps a lot.").) Indeed, both IHO Carter and SRO Harrington analyzed and discussed the record at length in their analysis of whether 30-minute sessions were appropriate for A.D.  IHO Carter concluded that the IEP's 30-minute sessions (as opposed to 60-minute sessions) for occupational therapy, physical therapy, and speech language therapy were appropriate because A.D. "emotionally and physically can't sustain a longer period of time than that."  (R. 66.)  SRO Harrington reasoned that although iHOPE staff and Plaintiff preferred 60-minute sessions for A.D., the hearing record indicated that A.D. "showed minimal and limited responses, slept frequently, was lethargic and medically fragile, and therefore [was] unable to emotionally and physically sustain a related services session longer than 30 minutes."  (R. 25.)  Moreover, the SRO noted that the record reflected that A.D.'s session lengths may be "modified" and increased as A.D. demonstrated progress throughout the year, which she deemed to be appropriately tailored to A.D.'s needs.  (R. 26.)  Thus, the Court finds the SRO's conclusion to be reasonable and well-supported by the record, and agrees that A.D. did not require 60-minute related services sessions in order to receive a FAPE.  *See Carrillo*, 2021 WL 4137663, at *18–19 (concluding SRO's approval of reduction of related services to 30-minute sessions was appropriate where record showed student tired quickly).

      6.    <u>SRO's and IHO's Alleged Consideration of Impermissible Retrospective Evidence</u>

Lastly, Plaintiff claims that the 2018–19 IEP had "two critical omissions: assistive technology devices and services, and 12-month 'extended year' services.'" (Dkt. 46, at 20.) As an initial matter, the Court finds that the SRO correctly determined that both claims were procedurally barred because Plaintiff had failed to include the arguments in her DPC. (*See* R. 14–15 (SRO Harrington concluding that Plaintiff's assistive technology claim and 12-month extended services claim were outside the scope of review); R. 898–900 (DPC is devoid of references to either assistive technology or "extended year" services).) The Court also concludes that both claims fail on the merits.

Regarding the first alleged omission, the Court finds that Plaintiff's argument defeats itself. If the Court were to find that the IEP was substantively inadequate because of the failure to require assistive technology devices and services, then the Court would have to deny reimbursement to Plaintiff based on the next *Burlington/Carter* prong—i.e., that "the parents' alternative private placement was appropriate," *Ventura de Paulino*, 959 F.3d at 526-27 (internal quotation marks omitted)—because iBRAIN lacked the required assistive technology devices and services (which Plaintiff was troublingly unaware of) and thus was not an appropriate alternative placement.[16] (*See*

---

[16] The Court notes the paradoxical and unsatisfying nature of this outcome, which results in parents being punished because iBRAIN lacked the necessary teachers and services to qualify as an appropriate placement in the 2018–19 school year. The Court further notes that some of the parents who moved their children to iBRAIN, seemingly at iBRAIN's behest, (1) did not speak English fluently, *see Melendez*, 2023 WL 4362557, at *4 (noting that the plaintiff parent of an iBRAIN student "often requires a Spanish interpreter to communicate in English"), and (2) had few financial resources, *see* R. 907 (noting that Plaintiff's annual income is less than 10% of iBRAIN's annual tuition). Moreover, the Court notes that iBRAIN's enrollment contract requires parents to pay "any balances due to iBrain" (where tuition is at least $144,000 annually) if the state ultimately does not find iBRAIN to be an appropriate placement. (R. 1073.) Thus, the Court is concerned about the dozens of iBRAIN cases in this Circuit that might result in financially disastrous consequences for severely disabled children's families, with little consequence for the school that failed to provide legally adequate services. The Court's concern is compounded by the

R. 71–72, 861–62.)  Thus, even if the IEP erroneously failed to include assistive technology devices and services, that omission does not warrant reimbursement of Plaintiff for alternatively placing A.D. at iBRAIN.

Regarding the second purported omission, SRO Harrington reviewed the record and found that the IEP contained a typographical error regarding A.D.'s eligibility for an extended school year, which did not rise to a denial of a FAPE because the IEP was otherwise clear that A.D. would receive 12-month, extended year services.  *See* R. 23, n.10 (finding that "both the March 2018 IEP and the prior written notice did indicate that the student was 'best served in a 12:1+4 where he can work on academic, life skills, and receive on going [sic] support on a 12 month basis with a small ratio' . . . . The minutes from the March 2018 IEP meeting also indicated that the program recommendation was for a 12-month program . . . . Additionally, the district's supervisor of psychologists testified that the failure to identify 12-month services on the IEP 'appear[ed] to be a clerical error' as the student was 'entitled, clearly, without question, to 12-month services[.]'" (citations omitted)); *id.* ("Given the forgoing, the evidence in the hearing record supports a finding that the omission of 12-month services on the particular portion of the IEP dedicated to such services was a clerical error and does not rise to the level of a denial of a FAPE.  To hold otherwise 'would exalt form over substance' (quoting *M.H. v. N.Y.C. Dep't of Educ.*, No. 10-CV-1042 (RJH), 2011 WL 609880, at *11 (S.D.N.Y. Feb. 16, 2011)); *id.* (finding an IEP appropriate, notwithstanding that a recommendation was omitted from the IEP because of a clerical error, where the recommendation "appeared in the CSE meeting minutes" and "was reflected in the conduct of the parties").

---

fact that the families in these cases are represented by a law firm that is affiliated with iBRAIN, including in this action.

Thus, the Court finds that the IEP's omissions of assistive technology services and an extended school year did not constitute a denial of a FAPE for A.D.

*** 

In sum, the Court finds that Defendants provided A.D. with a substantively adequate FAPE for the 2018–19 school year.

## II.   The Court Need Not Consider Remaining *Burlington/Carter* Factors

Plaintiff alleges that SRO Harrington erred in declining to analyze the remaining *Burlington/Carter* factors.   (*See* Dkt. 46, at 24–25 ("IHO Carter applied a deficient Prong II Burlington/Carter analysis, and SRO Harrington failed to correct same, warranting reversal of the SRO.").)   Plaintiff is squarely wrong.   In fact, SRO Harrington correctly applied the *Burlington/Carter* test because she found that A.D. had been offered a FAPE for the 2018–19 school year, and therefore SRO Harrington did not need to analyze the remaining factors. Similarly, here, the Court declines to analyze the remaining *Burlington/Carter* factors because it concludes that the SRO's and IHO's findings are amply supported by the record and that A.D. received a FAPE for the 2018–19 school year.   *See J.L. v. City Sch. Dist. of N.Y.*, No. 12-CV-1516 (CM), 2013 WL 625064, at *14 ("Because I have affirmed the SRO's decision that the IEP afforded the child a FAPE, there is no need for this Court to address either the adequacy of the parents' placement or the equitable considerations supporting reimbursement of private school tuition."); *Polanco*, 2023 WL 2242764, at *7 ("Because [the student] has not been denied a FAPE, it is unnecessary to reach the latter prongs of the analysis: whether the alternative private placement was appropriate, and whether equitable considerations favor reimbursement."); *c.f. E.W.K.*, 884 F. Supp. 2d at 57 ("In fact, the SRO declin[ing] to reach the issue of whether Plaintiffs' unilateral placement . . . was appropriate, as he found that Defendants offered [Plaintiff's child] a FAPE for the relevant school years.").

## CONCLUSION

For the reasons discussed above, the SRO's decision is affirmed, Plaintiff's motion for summary judgment is denied, and Defendants' cross-motion for summary judgment is granted. The Complaint is accordingly dismissed.   The Clerk of Court is respectfully directed to enter judgment accordingly.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated:  September 22, 2023
        Brooklyn, New York